Elliot S. Kaplan (EK-6683)
K. Craig Wildfang (KW-0294)
Anne M. Lockner (AL-1728)
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, Minnesota  55402-2015
Telephone:  612-349-8500
Facsimile:  612-339-4181

COUNSEL FOR PLAINTIFFS BEST BUY STORES, L.P.,
MAGNOLIA HI-FI, INC., AND GEEK SQUAD, INC.

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| BEST BUY STORES, L.P., MAGNOLIA HI-FI, INC., AND GEEK SQUAD, INC., | **AMENDED COMPLAINT** |
| Plaintiffs, | **MDL No.** 1575 |
| v. | **Case No.**  03-CV-6284-JG-RLM |
| VISA U.S.A. INC. and MASTERCARD INTERNATIONAL, INC., | |
| Defendants. | |

---

Plaintiffs Best Buy Stores, L.P., Magnolia Hi-Fi, Inc., and Geek Squad, Inc. (collectively "Best Buy"), by their undersigned attorneys herein, allege for their Amended Complaint against Visa U.S.A. Inc. ("Visa") and MasterCard International, Inc. ("MasterCard") (collectively referred to as "Defendants"), upon knowledge with respect to their own acts and upon information and belief with respect to all other matters, as follows:

# I.
## INTRODUCTION

1.      Best Buy owns and operates thousands of retail stores throughout the United States.  Like millions of other retail establishments, Best Buy accepts Visa and MasterCard credit cards as a form of payment along with cash, checks, travelers checks, and other plastic credit, debit, and "travel and entertainment" cards.

2.      Defendants Visa and MasterCard are structured as open, joint-venture associations with members (primarily banks) that issue credit and debit payment cards and/or acquire merchants who accept those payment cards.  Most banks in the United States are members of both Visa and MasterCard.  Visa and MasterCard provide network services through which their member banks process payments made with their respective credit and debit cards.

3.      Best Buy pays a "merchant discount fee" to the acquiring member bank for these network services.  This merchant discount fee includes both processing costs and the interchange fee that is fixed by agreement among the issuing and acquiring member banks of Visa and MasterCard through the Boards of Directors of these associations.  This interchange fee is a non-negotiable floor on what Best Buy pays to its acquiring bank and constitutes the majority of the merchant discount fee.

4.      Visa and MasterCard have market power in the relevant markets both collectively and separately.  In the recent case brought by the Department of Justice against Visa and MasterCard under the Sherman Act, the Court held after a bench trial that: "[E]ven a cursory examination of the relevant characteristics of the network market reveals that whether considered jointly or separately, [Visa and MasterCard] have market power."  *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 341 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003) (the "DOJ Action.").  The highly concentrated general purpose card network services market includes only

2

four major competitors (Visa, MasterCard, American Express, and Discover). In 2002, Visa and MasterCard controlled over 74% of the volume of credit and charge card transactions (Visa — 42%; MasterCard — 31%). If only credit card network services are considered, their combined share in 2002 was 87% (Visa — 50%; MasterCard — 37%). Significant barriers to entry exist in the general purpose card network services market, with Discover being the most recent entrant in 1986.

5.      In the DOJ Action, the Department of Justice challenged Defendants' "exclusionary" rules that prohibited their members from issuing cards on competing networks, namely American Express and Discover. Under these rules, members of Visa or MasterCard would forfeit their right to issue Visa and MasterCard cards if they issued a competitor's cards. The district court ordered that the exclusionary rules be revoked and permanently enjoined after finding that they are unreasonable restraints of trade in violation of Section 1 of the Sherman Act. *United States v. Visa U.S.A.*, 163 F. Supp. 2d at 330.

6.      Defendants enacted the exclusionary rules to exclude competition and unlawfully bolster and maintain their market power in the general purpose card and general purpose card network services markets in violation of Sections 1 and 2 of the Sherman Act. These rules harmed Best Buy and other merchants, because they artificially restricted the payment cards and network services available to merchants, inhibited price competition for merchant acceptance, and impeded product innovation that could benefit merchants. *See United States v. Visa U.S.A.*, 163 F. Supp. 2d at 329, 396. By strengthening their market power, the exclusionary rules also ensured Defendants' ability to conduct other anticompetitive behavior that harmed merchants.

7.      The market power of Visa and MasterCard is exemplified by the inability of Best Buy and other merchants to refuse to accept their ubiquitous credit cards. This market power has

Word 20083373.1

enabled Visa and MasterCard to impose supra-competitive interchange fees on credit and debit card transactions, and to increase those interchange fees with virtual impunity. In the DOJ Action, the Court held: "[G]eneral purpose card network services ... constitute[s] a product market because merchant consumers exhibit little price sensitivity and the networks provide core services that cannot reasonably be replaced by other sources." *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d at 338.

8.     Defendants' ability to price discriminate also illustrates their market power. Visa and MasterCard each charge differing interchange fees based, in part, on the degree to which a given merchant category needs to accept their credit cards. For example, transactions with internet merchants, which rely almost completely on credit and charge cards, carry higher interchange fees than "brick and mortar" merchants. While Defendants rationalize this difference by pointing to increased fraud in internet transactions, this explanation is belied by the fact that internet merchants, not Visa or MasterCard or their member banks, bear virtually all of the risk of loss from fraudulent transactions under the operating rules of Visa and MasterCard because of their inability to qualify for the Visa and MasterCard "payment guarantee," which requires a cardholder signature. The ability to price discriminate is recognized by economists as often an indicator of market power.

9.     With this market power, the member banks of the Visa and MasterCard associations agreed and conspired separately and together to unreasonably restrain competition by illegally fixing the price for general purpose card and debit card network services at supra-competitive levels. These price fixing arrangements are an unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

10.     Visa and MasterCard have also used these price fixing arrangements, along with other anticompetitive conduct, to unlawfully maintain and enhance their monopoly power in the general purpose card and debit card network services markets in violation of Section 2 of the Sherman Act. Visa and MasterCard have suppressed competing general purpose card network services and debit card network services and monopolized or attempted to monopolize the general purpose card and debit card network services markets. Visa and MasterCard have exploited their monopoly power by charging supra-competitive prices for general purpose card and debit card network services.

11.     Visa and MasterCard have also used their market power in the general purpose card network services market to maintain and enhance their position in the debit card network services market through unlawful tying arrangements. Visa and MasterCard adopted rules, known as the "Honor All Cards" rules, that forced merchants to accept their off-line debit cards, the *"Visa Check"* and *"MasterMoney"* cards, as a condition of being able to accept the Visa and MasterCard credit cards. The Honor All Cards rules were unlawful tying arrangements that violated Sections 1 and 2 of the Sherman Act.

12.     Through these tying arrangements and other anticompetitive behavior, Visa and MasterCard sought to suppress competing debit card network services and to monopolize the debit card network services market. These tying arrangements limited price competition for debit card network services, and stunted the growth of competing debit cards and debit card network services. These arrangements also artificially inflated the cost of competing debit card network services for Best Buy, reduced overall debit card usage and output in the debit card network services market, and limited debit card product and service innovation.

13.     In *In re Visa Check/MasterMoney Antitrust Litigation,* CV-96-5238 (E.D.N.Y.) (the "Class Action"), a class of approximately 5 million merchants similarly challenged the Honor All Cards rules as illegal tying arrangements that violated Sections 1 and 2 of the Sherman Act.  After the district court issued a partial summary judgment in favor of the class, Visa and MasterCard settled these claims and agreed to eliminate the Honor All Cards Rules as of January 1, 2004.

14.     Best Buy seeks monetary damages and injunctive relief to redress the violations of federal antitrust law and state laws discussed herein.

## II.
## JURISDICTION AND VENUE

15.     This Amended Complaint is filed under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15.  Claims arising under Minnesota law, Minn. Stat. §§ 325D.51 and 325D.53, and Cal. Bus. & Prof. Code § 17200 are also alleged.  This Court has jurisdiction of the federal antitrust law claims alleged herein under 28 U.S.C. §§ 1331, 1337, 2201, and 2202.  Jurisdiction of the state claims is vested in this Court pursuant to the principles of supplemental jurisdiction, in that they arise out of the same operative facts as the federal antitrust claims.

16.     Venue in the District of Minnesota is proper under 28 U.S.C. § 1391 and 15 U.S.C. §§ 15, 22 and 26.  Defendants transact business and are found in the District of Minnesota.  In particular, tens of thousands of retail establishments located in the District of Minnesota, including a number of Best Buy stores, accept Visa and MasterCard credit cards and are forced to accept *Visa Check* and *MasterMoney* debit cards and stored-value cards.  Hundreds of bank members of Visa and/or MasterCard located in the District of Minnesota issue

Word 20083373.1

Defendants' credit, debit, and stored-value cards and/or acquire retail merchant transactions for Visa and/or MasterCard credit cards and *Visa Check* and *MasterMoney* debit cards and stored-value cards. The interstate trade and commerce involved and affected by the alleged violations of the antitrust laws was and is carried on in part within the District of Minnesota. The acts complained of have had, and will have, substantial anticompetitive effects in the District of Minnesota.

### III.
### THE PARTIES

17.     Plaintiff Best Buy Stores, L.P. is a limited partnership formed under the laws of Delaware. Its principal place of business is in Minnesota.

18.     Plaintiff Magnolia Hi-Fi, Inc. is a Washington corporation with its principal place of business in Minnesota.

19.     Plaintiff Geek Squad, Inc. is a Minnesota corporation with its principal place of business in Minnesota.

20.     Defendant Visa, a Delaware corporation, is a national bank card association whose members include thousands of financial institutions. Visa's principal place of business is San Francisco, California. Visa is doing business and transacts business in the District of Minnesota.

21.     Defendant MasterCard, a Delaware corporation, is also a national bank card association whose members include thousands of financial institutions. MasterCard's principal place of business is Purchase, New York. MasterCard is doing business and transacts business in the District of Minnesota.

Word 20083373.1

## IV.
## CO-CONSPIRATORS

22.     Various persons, firms, corporations, organizations, and other business entities, some unknown and others known, have participated as co-conspirators in the violations alleged and have performed acts in furtherance of the conspiracies. Co-conspirators whose identities are presently known include, but are not limited to, the following: (a) the thousands of banks that have issued Visa and/or MasterCard credit cards and also issued *Visa Check* and/or *MasterMoney* debit cards are co-conspirators; (b) certain banks, that are members of the boards of directors of Visa or MasterCard and adopted and agreed to impose the challenged rules and tying arrangements upon retailers are co-conspirators; (c) approximately 1,000 banks, that are acquiring members of *both* the Visa and MasterCard associations and have contemporaneously agreed with Visa to require merchants to accept *Visa Check* and stored-value cards as a condition of their ability to accept the Visa credit card while agreeing with MasterCard to require merchants to accept *MasterMoney* and stored-value cards as a condition of their ability to accept MasterCard credit cards, are co-conspirators.

## V.
## DEFINITIONS

23.     As used in this Amended Complaint, the following terms are defined as:

a.      "Automated Teller Machine" ("ATM") is a machine used for banking services including withdrawals from deposit accounts and/or cash advances against a line of credit, after access by the account holder using either a debit card or credit card.

b.      "Point of Sale" ("POS") means a point of sale location for goods or services such as a retail store, hotel, airline ticket counter, gasoline service station, etc.

8

c.      "Electronic Funds Transfer" ("EFT") is a payment system industry term used to describe a broad range of technologies involving the electronic transfer of funds among financial institutions, typically using computers and telecommunications.

d.      "Credit card" is an access device, usually a payment card, enabling the holder to (i) effect transactions on credit for goods and services purchased, which are paid on behalf of the holder by the issuer of such device or (ii) obtain cash with credit extended by the issuer. Examples of credit cards are the Visa and MasterCard credit cards issued by members of the defendant bank card networks, as well as the *Discover*, *Bravo* and *Private Issue* cards issued by Morgan Stanley, Dean Witter & Co. and the *Optima* and *Blue* cards issued by American Express.

e.      "Charge card" or "Travel and Entertainment card" is an access device, usually a payment card, enabling the holder to purchase goods and services on credit to be paid on behalf of the holder by the issuer of such device. Typically, the contractual terms of such cards require that payment from the holder to the issuer be made in full each month, for all payments made on behalf of the cardholder by the issuer during the preceding month. The issuer does not extend credit to the holder beyond the date of the monthly statement, nor does it impose interest charges on the balance due except as a penalty for late payment. Examples of Charge cards are the American Express, Green, Gold, Platinum, and Black cards as well as the *Diners Club* and *Carte Blanche* cards issued by Citibank.

f.      "General purpose cards" collectively refers to credit cards and charge cards.

g.      "Debit card" is an access device, usually a payment card, enabling the holder, among other things, to affect a cash withdrawal from the holder's bank account at an

9

ATM or make a purchase at a point of sale which is debited against one or more of the holder's bank accounts. The *Visa Check* and *MasterMoney* cards are "off-line debit cards" accepted at the point of sale. A bank or other financial institution may issue a single payment card that can be used at both an ATM and at the point of sale.

h. "Payment card" means a device which enables the holder to perform the functions or obtain the access provided by one or more of the cards defined above, *i.e.*, general purpose cards, credit cards, charge cards, and debit cards.

i. "Bug" means the imprint of a proprietary trademark or logo on a payment card denoting that the card may be used to perform the functions or obtain the access associated with that specific logo or trademark, in addition to the functions available from the issuer of the card. A bank-issued ATM card may contain the bugs of several ATM networks, such as *Plus*, *Cirrus*, *NYCE*, *MAC* and *MOST*, which will permit the holder to access funds at any ATM associated with those networks. Certain ATM networks, such as *NYCE* and *MAC*, also operate debit programs. An ATM card bearing the bug of such a network will allow the holder to use her ATM card as a debit card at retail stores which accept the debit cards of such network.

j. "Network services" or "card services" means the infrastructure that Visa and MasterCard and their members provide to merchants through which payment transactions are conducted, including authorization, settlement, and clearance of transactions. In particular, the network services enable the Visa and MasterCard acquiring members to acquire payment transactions and to obtain authorization and payment from the issuing members.

k. "On-line debit transaction" means a point of sale debit transaction in which (similar to a cash withdrawal from an ATM) the bank that issued the cardholder's on-line debit card verifies that there are sufficient funds in the cardholder's account to cover the amount

10

of the retail purchase and electronically "puts a hold" on those funds in her account (reducing the amount available) during the retail transaction. The funds are then typically removed from the cardholder's account and deposited into the merchant's account in one day or less. *NYCE, MAC, MOST, Honor, Pulse, Shazam, Star, Maestro* and *Interlink* are among the many on-line debit card networks. On-line transactions also require customers to enter a PIN number, ensuring greater security to both the customer and the merchant.

l. "Off-line debit transaction" means a point of sale debit transaction in which, contrasting with an on-line transaction, the debit card issuing bank may or may not verify that there are sufficient funds in the cardholder's account to cover the amount of the retail purchase and may or may not put a hold on such funds during the course of the retail transaction. With an off-line transaction, funds are typically moved electronically from the cardholder's bank account to the merchant's account one to seven days after the date of the sales transaction. *Visa Check* and *MasterMoney* are off-line debit cards.

m. "Issuing bank" or "Issuer bank" means a member of Visa and/or MasterCard that issues Visa and/or MasterCard branded payment cards ("bank cards") to consumers for their use as payment systems and access devices. Issuing banks compete with each other to issue Visa and MasterCard cards to consumers.

n. "Acquiring bank" or "Acquirer bank" means a member of Visa and/or MasterCard that acquires payment transactions from merchants and acts as a liaison between the merchant and the bank card network to assist in processing the payment transaction. In a typical payment transaction, when a customer presents a Visa or MasterCard card for payment, the merchant relays the transaction information to the acquiring bank. The acquiring bank then contacts the issuing bank via the network for approval based on available credit or funds.

11

Acquiring banks compete with each other for the right to acquire payment transactions from merchants.

o.    "Interchange fee" in the United States general purpose and debit card network services markets means a fee that the card acquiring bank transfers to the card issuing bank for each retail transaction where the issuer's card is used as a payment device at one of the acquirer's retail store accounts.   The interchange fee is paid to the acquiring bank by the merchant, such as Best Buy, and constitutes a floor for the merchant discount fee. The following example illustrates how the Visa and MasterCard interchange fees work.   A customer presents a Visa or MasterCard card to a merchant, such as Best Buy, as a payment method.   The merchant contacts the acquiring bank to process the transaction.   The acquiring bank contacts the issuing bank via the network service for authorization based on the available credit or funds.   If the transaction is authorized, the issuing bank pays the acquiring bank the payment amount minus the "interchange fee," which is fixed by Visa or MasterCard. The acquiring bank then pays the merchant the payment amount minus the interchange fee and other charges for processing the transaction.   The total fee charged the merchant is known as the "merchant discount fee."   Visa or MasterCard receive a portion of the merchant discount fee.

p.    Merchant discount fee" means the total amount that the merchant, such as Best Buy, pays to its acquiring bank for each transaction involving a Visa or MasterCard credit or off-line debit card, and includes the interchange fee, association fees, and an additional processing fee that the acquiring bank charges.

q.    "Stored-value card" means the prepaid cards offered by Visa and MasterCard that allow a customer to place money on a card in advance of using it, allowing the card to operate somewhat like a gift certificate.   The stored-value card, however, looks similar to

12

other Visa and MasterCard products; it bears the customer's name and account number. Visa's prepaid cards are marketed as Visa Gift Cards, Visa Buxx, Visa TravelMoney, and Visa Payroll. MasterCard markets its stored-value cards as FlexCash, Free & Clear Prepaid MasterCard, and Key Possibilities Prepaid Gift Card.

## VI.
## RELEVANT MARKETS

24.     General purpose cards (credit and charge cards, but not proprietary cards) constitute a relevant distinct product market. The geographic dimension of this market is the United States ("General purpose card market").

25.     General purpose card network services constitute a relevant distinct   product market. This market is comprised of competition among the networks for merchant acceptance and competition among acquiring members of the Visa and MasterCard associations to acquire and process payments from merchants. The geographic dimension of this market is the United States ("General purpose card network services market").

26.     Debit cards constitute a relevant distinct product market. The geographic dimension of this market is the United States ("Debit card market").

27.     Debit card network services constitute a relevant distinct product market. The geographic dimension of this market is the United States ("Debit card network services market").

28.     Stored-value cards constitute a distinct product market. The geographic dimension of this market is the United States ("stored-value card market").

29.     General purpose cards are a distinct product from other methods of payment, including cash, checks, and debit cards. Merchants and consumers do not consider other payment systems to be substitutes for credit or charge cards, nor would they substitute other

payment systems for such cards, even in response to a significant, non-transitory increase in the associated fees. The existence of these other forms of payment is insufficient to prevent the existence or exercise of market power in the general purpose card market.

30. General purpose card network services are a distinct product and bundle of services from debit card network services. Merchant demand for general purpose card network services is distinct from merchant demand for debit card network services. Merchants do not consider debit card network services to be a substitute for general purpose card network services, and they would not substitute debit card network services for general purpose card network services, even in response to a significant, non-transitory increase in associated fees.

## VII.
## FACTUAL ALLEGATIONS

31. Visa and MasterCard are national bank card associations whose members include primarily banks, regional banking associations, and other financial institutions. Visa and MasterCard were established by their members to develop, promote and operate national bank card network services.

32. The members of the Visa and MasterCard associations are competitors both at the issuing and acquiring level. Visa issuing members compete with each other to issue Visa cards to consumers. Similarly, Visa acquiring members compete with each other to acquire payment transactions from merchants using Visa general purpose or debit cards. MasterCard issuing and acquiring members compete with each other in the same manner. The Visa and MasterCard associations also compete with each other and the other payment card networks for brand recognition among consumers and for merchant acceptance.

14

33.     Each of the Visa and MasterCard associations is governed by a Board of Directors elected by its members and is managed by a management team.  These management teams are responsible for day-to-day operations and have certain authority delegated by the Boards.

34.     The Boards of Visa and MasterCard are dominated by representatives of member banks that are significant issuers of Visa and MasterCard credit and debit cards.  Because of industry consolidation, as of 1999, the 22 banks that collectively sat on the Visa and MasterCard Boards accounted for 78% of the credit card volume issued on those two systems in the United States.  Issuer financial interests therefore dominate the governance decision-making process of these Boards.

35.     Under their original rules, the membership of Visa and MasterCard were distinct. Members of Visa could not issue MasterCard cards to their customers.  In 1976, Visa's rules were amended to permit "duality."  Thereafter, banks could be members of both Visa and MasterCard and issue both brands of credit cards.  Banks could also act as acquirers for both Visa and MasterCard.  Every major bank in the United States is a member of both Visa and MasterCard, and there is currently more than 95% overlap in the Defendants' memberships.

36.     Today, virtually every merchant that accepts Visa credit cards as a form of payment also accepts MasterCard credit cards.  There are very few exceptions to duality among the approximately 6,000 financial institutions that issue Visa and/or MasterCard cards, and the approximately 1,000 financial institutions that act as acquirers for Visa and/or MasterCard.

37.     Visa and MasterCard's dual membership accelerated two trends that have characterized and dominated the development of the Defendants' networks.  Because their memberships are virtually identical, the Defendants coordinate much of their activity through joint programs, consciously parallel activity and tacit collusion.  For example, while the Board

membership of Visa and MasterCard does not overlap, Board members of one Network wield power over the other through significant committee participation. Duality also facilitated a high degree of uniformity in interest rates and fees charged cardholders by issuers in the two associations, and in the interchange fees and merchant discounts charged to merchants.

**A.**     ***Defendants' Market Domination Through Unlawful Exclusion Of Competitors***

38.     Through anticompetitive and predatory behavior, Visa and MasterCard and their dual members have dominated the general purpose card and general purpose card network services markets. This domination has posed formidable barriers to new entrants, and these barriers were raised even higher by collective conduct aimed at suppressing new competition and making entry as difficult as possible. When a competitor persisted and entered the market despite the barriers posed by the Defendants' dominance, Visa and MasterCard resorted to overt predation.

39.     In 1986, when Sears introduced the Discover card, the first national general purpose credit card to enter the market in a generation, Visa and its members organized a boycott of Discover card processing. Sears responded to Visa's boycott by establishing its own state-of-the-art network services that it offered to merchants at a lower cost to process all of their payment card transactions, including Visa, MasterCard, and Discover cards. Visa adopted a rule prohibiting any Visa member from allowing Sears to acquire Visa card transactions, which essentially frustrated a merchant's choice to consolidate its payment card processing business with Sears.

40.     When Sears attempted to become a member of Visa to issue Visa cards, Visa's Board of Directors refused Sears' application for membership on the grounds that Sears continued to operate the competing Discover network. At the same time, Visa enacted By-law

16

2.06 that excluded any competitors, such as Discover and American Express, from ever becoming a Visa member. Visa's actions seriously undermined Discover's ability to compete in the payment card and network services markets. (Discover Financial Services and the Discover Card is now owned by Morgan Stanley, Dean Witter & Co., which is neither owned nor affiliated with Sears.)

41.     Similarly, in 1987, when American Express entered the revolving credit card market with the *Optima* card, Visa's Chief Executive Officer sent a telegram to 5,500 bank members of both Visa and MasterCard calling upon them to boycott American Express and its products, such as American Express traveler's checks.

### (1)     *Visa and MasterCard enact unlawful exclusionary rules*

42.     Defendants' attempts to exclude competitors culminated in the adoption of "exclusionary" rules that prohibit their members from issuing cards on competing networks, especially American Express and Discover. Under these rules, if a member of Visa or MasterCard issues a competitor's cards, then that member forfeits the right to issue Visa and MasterCard cards.

43.     In 1991, Visa adopted its exclusionary rule, By-law 2.10(e), barring its members from issuing any competing payment cards. This rule exempted MasterCard, permitting Visa's dual members to continue issuing MasterCard payment cards. The rule also exempted Diner's Club and Carte Blanche, both of which are issued by Citibank. Later, in response to American Express' attempt to solicit MasterCard banks, MasterCard adopted a similar exclusionary rule, its Competitive Programs Policy. These exclusionary rules deprive existing and new competitors of a marketing outlet at the 6,000 largest and most appropriate vendors of their products, *i.e.*, the dual bank members of Visa and MasterCard. The actions were tantamount to requiring a

17

manufacturer of a product primarily sold in department stores to build 6,000 department store chains. These collective actions increased considerably the "sunk costs" required to enter the market.

44.     By depriving new entrants such as Discover or an upstart general purpose card network of a means for efficient and speedy card issuance, the Defendants also dissuaded or slowed stores from accepting competing general purpose cards, since merchant acceptance of a card is premised on widespread issuance of that card.

45.     The Visa and MasterCard exclusionary rules are not effective or enforced outside of the United States, as a result of pressure exerted on Defendants or their international affiliates by international governmental bodies.  As a consequence, non-United States banks which issue Visa and MasterCard cards can and do also issue American Express and/or Discover cards in foreign countries.  The ability of non-U.S. banks to issue Visa and MasterCard and also issue American Express and Discover cards has enhanced competition in the general purpose card market in foreign countries.  The ability of non-U.S. banks to issue Visa and MasterCard and also issue American Express and Discover cards has enhanced competition in the general purpose card market in foreign countries.

### (2)     *Exclusionary rules are revoked and permanently enjoined in the DOJ Action*

46.     In the DOJ Action, the United States District Court for the Southern District of New York, after a bench trial, rendered an opinion setting out findings of fact and conclusions of law and adjudging the exclusionary rules described above to be unreasonable restraints on trade in violation of Section 1 of the Sherman Act.  In so holding and adjudging the Defendants' exclusionary rules to violate Section 1 of the Sherman Act, the Court made the following findings, among others, which are binding on Defendants in this action:

a.  "[E]ven a cursory examination of the relevant characteristics of the relevant network market reveals that whether considered jointly or separately, [Visa and MasterCard] have market power." *United States v. Visa, U.S.A.*, 163 F. Supp. 2d at 341.

b.  Visa and MasterCard's "exclusionary rules have significantly reduced product output and consumer choice in the issuing market and have reduced price competition in the network services market." 163 F. Supp. 2d at 330.

c.  "[T]he rules restrain competition in the network market because they prevent American Express and Discover from offering network services to the consumers of those services, the members of the Visa and MasterCard associations." 163 F. Supp. 2d at 379.

d.  "Network services output is necessarily decreased and network price competition restrained by the exclusionary rules because banks cannot access the American Express and Discover networks; conversely American Express and Discover cannot access the issuing competencies and segmented marketing expertise of the banks; nor their more profitable relationship customers with checking accounts, attributes which cannot be provided by the smaller banks and monoline banks to which American Express and Discover do have access." 163 F. Supp. 2d at 379.

e.  "Because of the defendants' exclusionary rules American Express and Discover have not been able to convince U.S. banks to issue cards over their networks.  This prevents them from competing in the network services market for the business of bank issuers." 163 F. Supp. 2d at 382.

f.  "[M]erchants would benefit from an increase in competition among general purpose card networks . . . [M]erchants – and ultimately consumers – have an interest in the vigor of competition to ensure that interchange pricing points are established competitively." 163 F. Supp. 2d at 395.

47.  On September 17, 2003, the Second Circuit Court of Appeals affirmed the district court's ruling that Visa and MasterCard's exclusionary rules are unreasonable restraints on trade in violation of Section 1 of Sherman Act, and its order granting permanent injunctive relief. *United States v. Visa U.S.A., Inc.*, 344 F.3d 229 (2d Cir. 2003).

43.  The exclusionary rules unlawfully weakened competition in the general purpose and debit card markets, as well as in the network services market, by limiting competitors' card

19

and service output.  This lack of competition harmed merchants, such as Best Buy, because it restricted the competitive strength of other payment cards, such as Discover and American Express, for merchant acceptance, and thus limited price competition with other payment cards to attract merchant acceptance, and limited the development of products and services that would benefit and attract merchants.  The exclusionary rules bolstered Visa and MasterCard's market power, which ensured the Defendants' ability to conduct other anticompetitive behavior that has also harmed merchants, including Best Buy.

**B.    *Defendants' Illegal Setting Of Interchange Fees***

48.    Acquiring members of Visa and MasterCard individually compete to contract with merchants, such as Best Buy, to acquire their payment card transactions in return for a "merchant discount fee."  This merchant discount fee is primary comprised of uniform, fixed interchange fees set by Visa and MasterCard.  All members have agreed to the fixed uniform interchange fees for most or all of their transactions, and, thus, competition among acquiring members for merchant acceptance of both their general purpose and debit card network services is limited because they have agreed not to negotiate below the fixed interchange fees.  The setting of the uniform fixed interchange fees amounts to horizontal price-fixing in violation of the Sherman Act.

49.    The conspiracy and agreement to fix interchange fees for both general purpose card and debit card network services occurred among the members within each of the Defendants' associations (*i.e.,* an intra-association conspiracy).  Visa and MasterCard through their dual memberships also collectively agreed to fix these interchange rates at supra-competitive levels (*i.e.,* an inter-association conspiracy).

Word 20083373.1

50.     As a result of the market power of Visa and MasterCard, merchants have no option but to pay the fixed interchange fees for both general purpose card and debit card network services.  The Court in the DOJ Action held:  "[Merchants] cannot refuse to accept Visa and MasterCard even in the face of significant price increases because the cards are such preferred payment methods that customers would choose not to shop at merchants who do not accept them." 163 F. Supp. 2d at 340.  The members of Visa and MasterCard have abused this market power by fixing the interchange fees for general purpose card and debit card network services at supra-competitive levels.

51.     Not only are these interchange fees collectively set by the memberships of Visa and MasterCard, but there is also no transparency whatsoever in how the fees are collectively determined.  Instead, the Boards of Visa and MasterCard set their interchange fees at a profit maximizing level without any input from merchants or consumers.  Merchants and consumers have no ability to constrain Visa and MasterCard's market power, which they use to fix, raise, and stabilize interchange fees at supra-competitive levels.

52.     The setting of fixed interchange fees by Defendants and their members is not reasonably necessary to achieve procompetitive benefits from an integration of economic activity, as it is not likely to benefit, or potentially benefit, consumers by expanding output, reducing price, or enhancing quality, service, or innovation.

53.     Any alleged procompetitive or efficiency related effects of the fixed interchange fees do not justify or outweigh the anticompetitive effects.  The agreement among members of Visa and MasterCard to set interchange fees at supra-competitive levels is not necessary to market general purpose and debit card network services, especially given Defendants' market power.

Word 20083373.1

54.     The fact that the interchange fees are fixed at supra-competitive levels establishes that the price-fixing agreement harms competition by increasing the ability or incentive to raise price above what likely would prevail in the absence of the price-fixing agreement.

55.     Visa recently made clear that its main strategy in setting interchange fees is to "compete" with MasterCard for issuance among their common membership by the seriatim raising of interchange fees, thereby promising greater interchange revenues to their common membership through overt price fixing.

56.     In June 2002, for example, Visa announced that it would raise its interchange fees in a "competitive" response to an interchange fee increase that MasterCard had implemented in January 2002.   A similar interchange fee increase announcement was made by Visa in February 2004.   In both instances, the only public justification provided by Visa for the interchange fee increase was its desire to "compete" for issuance of its payment cards through the promise of higher interchange revenues to its member banks.   Moreover, since the class settlement, Visa and MasterCard have increased interchange fees twice, costing Best Buy approximately $5 million in additional fees annually.

57.     Defendants' collective setting of interchange fees among their competing member banks constitutes an illegal price fixing arrangement.   Their ability to charge these supra-competitive fees to merchants is the result of their market power.   The Court in the DOJ Action recognized that market power, holding:   "[B]oth Visa and MasterCard have raised prices and restricted output without losing merchant customers."   163 F. Supp. 2d at 342.

58.     The anticompetitive nature of Defendants' collective setting of interchange fees has not gone unnoticed by foreign regulators, who have issued findings and implemented

reforms that restrict the ability of Visa and MasterCard and their members to set interchange fees at supra-competitive levels.

### *(1)        Proceedings before the Commission of the European Communities*

59.        On May 23, 1997, EuroCommerce, a European retailers organization, filed a complaint with the Commission of the European Communities (the "EC Commission"), challenging the collective setting of multilateral credit and debit interchange fees by Visa.  In its complaint, EuroCommerce alleged that the agreement of the Visa International Board to set interchange fees constituted a price-fixing cartel among its member banks.

60.        After extensive proceedings before the EC Commission, Visa International proposed that it modify the means by which it sets multilateral interchange fees, converting from a system in which its Board unilaterally sets interchange fees at any level it deems appropriate (independently of any specific services provided by issuing banks to acquiring banks and merchants) to an objective, cost-based approach.

61.        Visa International agreed as part of this proposal to provide the EC Commission with periodic cost studies justifying credit and off-line debit interchange fees based upon expressly defined cost categories, and to have these cost studies audited by an independent accounting firm approved by the EC Commission.

62.        Visa International's proposal called for its interchange fee reductions on credit and off-line debit to take place over a five-year period.  According to Visa International, the impact of the agreed reductions in credit and off-line debit interchange would result in an interchange revenue decrease to its member banks of approximately 20 percent.

Word 20083373.1

63.     In approving the Visa International proposal to move to a cost-based interchange fee structure on July 24, 2002, the EC Commission made the following findings with respect to the challenged interchange scheme:

> [T]he MIF [multilateral interchange fee] is an agreement between competitors, which restricts the freedom of banks individually to decide their own pricing policies, and distorts the conditions of competition on the Visa issuing and acquiring markets.  All Visa banks issue Visa cards and are thus competitors on the Visa issuing market.  Some Visa banks are also acquirers, and compete with each other in the Visa acquiring market.  Both these activities are affected by the MIF, and the Visa member banks are thus competitors as concerns their agreement on the MIF.  In particular, the agreement on a collective MIF between the banks involved is likely to have an effect on price competition at the acquiring and issuing level since the MIF agreement will fix a significant part of the parties' final costs and revenues respectively.

64.     The EC Commission found that under the existing regime, the Visa International Board could set the interchange fees at "any level it wished, independently of the costs of the specific services provided by issuing banks to the benefit of merchants."  The EC Commission concluded that because of Visa International's monopoly power, merchants could not resist fee increases by threatening to discontinue acceptance of the ubiquitous payment products, leading to the perverse situation in which "competition" between Visa and MasterCard for issuing banks resulted in higher interchange fees.

65.     In reaching its conclusion that the Visa International interchange fee scheme is anticompetitive, the EC Commission noted that the supra-competitive fees adversely impact the payment card issuing market by discouraging innovation and efficiency and possibly leading to the oversupply of credit and off-line debit cards.  As it relates to the acquiring market, the EC Commission concluded that the supra-competitive fees negatively impact both merchants and consumers by imposing a floor on the merchant discount rate, which is ultimately passed on to all consumers (credit and non-credit) in the form of higher product prices.

Word 20083373.1

66.     A similar proceeding against MasterCard Europe has been initiated before the EC Commission.   The EC Commission recently announced its preliminary views on MasterCard Europe's interchange fee scheme, noting that "[r]etailers have no choice but to accept MasterCard payment cards" and "fees for this payment system have been rising steadily . . . [which] could indicate that MasterCard has unlimited discretion to set the interchange fees at a revenue-maximizing level."   The EC Commission offered its preliminary view that MasterCard Europe's interchange fees "should not be set above the costs of providing services to the benefit of retailers and consumers," and that it "should make its fee structure transparent to retailers."

### (2)     *Proceedings before the Office of Fair Trading in the United Kingdom*

67.     On September 1, 2000, the British Retail Consortium ("BRC") made a complaint to the United Kingdom Office of Fair Trading ("OFT") against MasterCard and Visa challenging the collective setting of interchange fees as an anticompetitive price fixing arrangement among member banks in violation of British competition laws.

68.     The OFT notified MasterCard in September 2001 of its view that the agreement among MasterCard's member banks on the level of interchange fees is in breach of British competition laws and does not qualify for exemption.   At the beginning of 2002, MasterCard and other interested parties were given an opportunity to respond both orally and in writing to the OFT.

69.     In February 2003, the OFT published its preliminary conclusion that MasterCard's practice of allowing its members collectively to set interchange fees violates British competition laws.   In particular, the OFT found that the practice of MasterCard's member banks in collectively setting interchange fees "leads to an unjustifiably high fee being paid to card issuing banks on every transaction made by a MasterCard credit or charge card in the UK."

25

70.     After considering written and oral submissions by MasterCard, the OFT rendered its preliminary conclusion "that MasterCard has not justified the level at which it has set its [interchange]." Noting that MasterCard had taken the position that it should be permitted to set its interchange fees at a level that covers the costs of the payment system services that issuers provide to merchant acquirers and retailers, the OFT found that "the MasterCard [interchange fee] has been set a level much higher than these costs."

71.     The OFT is due to render it final decision on MasterCard's interchange fees sometime this year.  It is anticipated that it will then evaluate Visa's interchange setting practices.

### (3)     Proceedings before the Reserve Bank of Australia

72.     The collective interchange setting practices of Visa and MasterCard have also come under the scrutiny of Australian regulators.  In October 2000, the Payment Systems Board of the Reserve Bank of Australia and the Australian Competition and Consumer Commission published a detailed study of debit and credit card schemes, which concluded, *inter alia*, that

> Competitive pressures in the card payment networks in Australia have not been sufficiently strong to bring interchange fees into line with costs.  The end-users of these services — cardholders and merchants — have no direct influence over the setting of interchange fees but must rely on their financial institutions to represent their interests.  Large financial institutions have the dominant influence on interchange fee setting; however, since they are both issuers and acquirers and benefit from the revenue generated, they have little incentive to press for lower interchange fees.  . . .  As a consequence, the price signals and competitive responses that would be expected to put pressure on margins in card payment networks have not worked effectively.

73.     Against the background of this October 2000 study, the Reserve Bank of Australia formally brought the Visa and MasterCard credit and debit card schemes under its regulatory ambit in April 2001.

74.     After an investigation and proceedings, the Reserve Bank of Australia concluded in a Consultation Document published in December 2001 that the collective setting of interchange fees by the member banks of Visa and MasterCard is anticompetitive. In reaching this conclusion, the Reserve Bank noted that

> [C]urrent arrangements for the collective setting of interchange fees in the designated card schemes are not in the public interest. [T]hese arrangements are characterized by their rigidity, lack of transparency and absence of any clearly articulated methodology, and they have been able to persist because of the absence of strong competitive conditions.

75.     The Reserve Bank further noted that as a result of the market power of Visa and MasterCard in the credit card market, merchants cannot effectively resist the setting of fees "above the socially optimal level," resulting in "inefficiently high levels of credit card usage, with little risk of losing merchant acceptance."

76.     In August 2002, the Reserve Bank of Australia published its Final Reforms and Regulation Impact Statement. In that Statement, the Reserve Bank concluded that Visa and MasterCard "[i]nterchange fees have been set without any external scrutiny or accountability to the community . . . and the fee-setting process has lacked transparency and any objective benchmarks against which interchange fees might be assessed."

77.     As with the EC Commission, the Reserve Bank instituted reform measures, which were implemented in 2003, that involved the adoption of an objective, cost-based benchmark for determining credit card interchange fees.

78.     Visa and MasterCard appealed the Reserve Bank's proposed interchange reform measures to the Federal Court of Australia, which issued a detailed Order dated September 19, 2003, rejecting Defendants' appeal on all grounds. *Visa International Service Association v. Reserve Bank of Australia*, [2003] F.C.A. 977.

Word 20083373.1

79.    As a consequence of these actions by the Reserve Bank, credit card interchange fees in Australia have been projected to fall by approximately 40 percent.

**(4)    Best Buy has suffered damages from Defendants' illegal setting of interchange fees**

80.    The concerns regarding the anticompetitive nature and impact of the collective setting of interchange fees by Defendants that led to action by the European and Australian regulators exist as well in the United States.  The members of Visa and MasterCard have separately and collectively set interchange fees as part of overt price fixing arrangements.  They then used their market power to impose these collectively set fees on merchants, who have no option but to pay them.

81.    As a result of Defendants' illegal conduct, Best Buy has suffered actual damages in excess of $800 million from paying these fixed supra-competitive interchange fees for Visa and MasterCard general purpose and debit card network services.

**C.    Defendants' Illegal Tying Of Their Off-Line Debit Cards To Their Dominant General Purpose Cards**

82.    After Visa and MasterCard and their dual members had consolidated their control of the general purpose card and network services markets, they moved to convert cash, check and traveler's check retail transactions to debit transactions, and they sought to monopolize the market for debit card network services in order to extract supra-competitive interchange revenues.

83.    When entering the debit card market, Visa and MasterCard developed off-line debit cards called *Visa Check* and *MasterMoney*.  In an "on-line" debit card transaction, the cardholder's account is debited and the merchant's account is credited in one day or less.  In "off-line" debit transactions, the electronic transfer of money from the consumer's bank account

to the merchant's account typically occurs one to seven days after the sales transaction. Off-line debit transactions are less secure than on-line transactions for merchants and consumers alike. Among the greater risks associated with an off-line transaction is the use of a cardholder signature rather than an alpha-numeric "PIN" (personal identification number), which results in greater fraud losses for both merchants and consumers. Off-line debit cards are sometimes referred to signature debit cards.

84. Initially, throughout the 1970s and 1980s, Defendants did little to promote the use of their off-line debit cards, because debit was not a common method of payment at the point of sale. In the early 1990s, however, Defendants became increasingly concerned about the potential growth of on-line debit as a preferred payment method by merchants and consumers at the point of sale. In response to this concern, Visa and MasterCard began aggressively to promote the issuance of their off-line debit cards to be used at the point of sale, as well as to restrain the growth of the more secure, efficient, and less costly alternative, "on-line" debit.

*(1) **Defendants' anticompetitive efforts to promote their off-line debit cards***

85. Normally, a merchant, such as Best Buy, decides to accept or refuse a particular payment system after reviewing a combination of factors, including the safety, convenience and cost of accepting each payment system. Merchants also consider whether acceptance of a particular payment system will facilitate sale transactions that might not otherwise occur.

86. With Defendants' off-line debit cards, however, *Visa Check* and *MasterMoney,* merchants were not given the choice of whether to accept this payment system based upon all of the above factors. Instead, Defendants enacted "Honor All Cards" rules that forced merchants to accept their off-line debit cards at the point of sale as a condition of accepting their ubiquitous credit cards.

29

87.    Under these rules, Visa, MasterCard and their dual members were able to charge merchants the same or similar price fixed interchange fees for their *Visa Check* and *MasterMoney* debit card network services as for their credit card network services.   These interchange fees were supra-competitive compared to competing regional on-line debit cards. However, because of the Honor All Cards rules, merchants were forced to accept these debit cards with the supra-competitive fees, as it was not economically feasible to forego acceptance of their credit cards.

88.    While compelling merchants to accept their off-line debit cards and actively promoting their issuance and use at the point of sale, Visa and MasterCard concurrently initiated a concerted effort to suppress the growth of on-line debit transactions.   Recognizing that regional on-line systems are cheaper, faster and safer for all parties to a retail sales transaction, Visa and MasterCard suggested to their member banks that the competition from on-line debit cards be eliminated through boycott.   At the September 1995 American Bankers Association meeting, the President of a prominent Visa and MasterCard member bank signaled the assembled dual Visa/MasterCard membership to follow the lead of his bank and issue *Visa Check* and *MasterMoney* cards without regional on-line debit network bugs.   Other Association members delivered similar signals, which were followed by numerous dual Visa/MasterCard member banks removing on-line debit network bugs from their *Visa Check* and/or *MasterMoney* cards. Such activities further exacerbated the purposeful tendency of their tying arrangements to foreclose competition from far less expensive and superior payment systems.

89.    In addition to taking actions to deter and inhibit the growth of on-line regional networks and the use of on-line debit at the point of sale, Defendants also adopted elaborate measures to deceive merchants into believing that they were receiving Visa or MasterCard credit

30

cards, when in fact they were receiving *Visa Check* or *MasterMoney* debit cards from consumers neither needing nor wanting to buy on credit.

90.     Defendants designed their off-line debit cards so that the cards would be visually and electronically indistinguishable from Visa/MasterCard credit cards. The Defendants also instructed their members to avoid communications with merchants which might disclose the true identity and the fixed and supra-competitive fee structure of *Visa Check* and *MasterMoney*.

91.     Visa's "Debit Card Training Materials and Customization Guide" urged Visa banks to avoid and deflect merchants' questions about the *Visa Check* interchange rate.  The Visa Guide noted that the "inability to tell the difference between Visa Debit and a Visa Credit Card" may result in confusion.  Visa's solution was to design the cardholder's statement in a manner that clearly distinguished the two distinct forms of payment. The Guide counsels, however, that the merchant can be kept in the dark about these visually indistinguishable payment cards. The Guide posed the following hypothetical question from a cardholder to a customer service representative: "Do I need to tell the merchant that I am using a debit card?" The Visa Guide's suggested answer is: "There's no need to provide a detailed explanation. Simply tell the merchant that you want to use the Visa card.  He or she will handle the transaction like any other Visa payment."

92.     Visa and MasterCard also purposefully concealed the debit cards and the arrangements tying them to the Visa and MasterCard credit cards by applying the identical fixed interchange fee for credit and debit.

93.     Many merchants were not alerted to the fact that they were being forced to accept these off-line debit cards until the late 1990's.  In 1994, Visa introduced slightly divergent *lowest*

interchange fees for *Visa Check* and Visa credit.  Then, in 1995, Visa began an aggressive national advertising campaign for *Visa Check*.

94.   Even after learning that they were accepting these off-line debit cards, merchants could not always determine when and how many *Visa Check* transactions they were being forced to accept until they received their processing bills.  Many *Visa Check* cards intentionally remained visually indistinguishable from Visa credit to merchants.

### (2)   *Visa and MasterCard's illegal tying arrangements catapulted the off-line debit cards into dominance and effectively foreclosed competition in the debit card market*

95.   When Visa and MasterCard initiated the *Visa Check* and *MasterMoney* programs in the 1970s, the number and dollar amount of such transactions were relatively small, accounting for under one-tenth of 1% of all Visa and MasterCard transactions. *Visa Check* and *MasterMoney* transactions represented a small minority of the transactions in the emerging debit card market.

96.   Over the years, the debit card market has grown significantly.  By 2003, 31% of all purchase transactions were made with debit cards.  It is predicted that debit cards will constitute over 50% of all purchase transactions by 2010.  As the debit card market grew, Visa and MasterCard carefully, relentlessly and stealthily fostered the domination of *Visa Check* and *MasterMoney* over the faster, safer and far less costly regional on-line debit networks.

97.   By the end of 1995, the foreclosing effects of the tying arrangements and anti-discrimination rules had catapulted the inferior and exorbitantly priced *Visa Check/MasterMoney* systems into a dominant position in the market.  That year, the number of *Visa Check* and *MasterMoney* transactions grew 80% over the previous year, compared to a 40% growth rate for

the safer, faster and much less costly on-line debit systems. From 1992 to 1996, the number of *Visa Check/MasterMoney* cards annually increased by an average of 56%.

98.     In 1996, Visa announced that *Visa Check* transactions alone had "increased nearly 800%" during "the last five years." By the end of 1996, there were more than 47 million *Visa Check/MasterMoney* cards in circulation issued by more than 4,400 Visa/MasterCard members. These cards were used in 1996 in approximately 1.2 billion retail transactions, comprising a dollar volume of approximately $46 billion.

99.     From 1996 to 2003, *Visa Check* and *MasterMoney* off-line debit transactions sky-rocketed. The dollar amount of retail transactions with Visa or MasterCard debit cards increased by 20% in 2002 alone, which was three times the growth of Visa and MasterCard credit card transactions. In 2002, *Visa Check* and *MasterMoney* were collectively used in approximately 8.1 billion transactions valued at $317 billion. Of these transactions, *Visa Check* alone constituted 6.5 billion transactions valued at $248 billion.

100.    As of September 30, 2003, Visa and MasterCard had collectively issued 194 million off-line debit cards. Today, approximately 25.7% of the 726.4 million Visa and MasterCard cards in circulation are debit cards.

101.    Although *Visa Check/MasterMoney* transactions initially represented a small percentage of the overall market for debit transactions, these off-line debit cards now constitute 60% of the transaction volume in the national debit card market (both off-line and on-line). Whereas, the competing regional on-line debit networks, such as *STAR, NYCE, MAC* and *MOST*, have only collectively secured approximately 32.8% of the overall debit card market despite offering safer, faster and far less costly services.

102.    In a free and unrestrained market, *Visa Check* and *MasterMoney* would have gained minuscule acceptance and market share in applications in which on-line debit could effectively be used, given their exorbitant, fixed and supra-competitive prices of Visa and MasterCard off-line debit transactions, and their pronounced inferiority relative to their on-line debit competitors. However, the synergistic effect of the Visa and MasterCard tying arrangements and the anti-discrimination rules, which prohibit a merchant from asking for another form of payment when *Visa Check* or *MasterMoney* is proffered (and when the merchant cannot ascertain that it is receiving a *Visa Check* or *MasterMoney* debit card rather than a credit card), was intended, and has proven to be, a powerful engine for market foreclosure.

103.    Merchants, including Best Buy, have suffered great monetary losses due to the forced acceptance and resulting unnatural dominance of the inferior and more costly *Visa Check* and *MasterMoney* off-line debit cards.  The cumulative loss to merchants for the much slower transfer of well over $100 billion in consumers' funds into the stores' bank accounts (one day or less for on-line debit versus one to seven days for *Visa Check/MasterMoney)* has been substantial in and of itself.

104.    This substantial loss, however, is dwarfed by the losses suffered through the forced payment of *Visa Check* and *MasterMoney* supra-competitive interchange fees.  In 1996, merchants were forced to pay approximately $580 million in *Visa Check/MasterMoney* interchange fees compared with approximately $90 million that they would have paid for typical on-line debit systems, such as *NYCE, MAC* and *MOST,* or for receiving cash, checks or traveler's checks.  By 2002, the amount merchants paid Visa and MasterCard acquirers for off-line debit transactions increased to $4.76 billion.

34

105.    The tying arrangements powerfully foreclosed competition and marginalized the market participation of superior and far less expensive on-line debit networks.  In 1996, for example, Visa's *Interlink,* which is not subject to a tying arrangement, lost a large portion of its market share to the *Explore* (now known as *Star*) debit network, because *Interlink's* interchange fee of $0.18 compared unfavorably with *Explore's* rate of $0.075 (on a typical $40 transaction — at higher transaction amounts the price disparity was much greater). At the same time, *Explore* and the other regional on-line debit networks actually lost market share to *Visa Check* and *MasterMoney* where, as noted, the price disparity is still greater, *i.e.,* $0.075 – *Explore* versus $0.476 — *Visa Check* versus $0.524 — *MasterMoney.*

106.    Visa and MasterCard have not tied their on-line debit cards, *Interlink* and *Maestro,* to their dominant credit cards, in part, because they do not want to increase usage of these less expensive systems and thereby depress the supra-competitive profits earned by the tied *Visa Check* and *MasterMoney* cards.

107.    *Visa Check* and *MasterMoney,* which are inferior and far more costly products, have quickly moved from a minority share of the market to dominance. *Visa Check's* market share alone far exceeds that of the entire competing regional on-line debit networks combined, all offering faster and safer services at a tiny fraction of the price charged for *Visa Check* or *MasterMoney.* The tying arrangements have effectively and substantially foreclosed the market and virtually eliminated the efficacy of competition on the merits.

### (3)    *Visa and MasterCard also tie their stored-value cards to their credit cards and, therefore, charge an unjustifiably high interchange fee on the stored-value cards.*

108.    In recent years, Visa and MasterCard have begun issuing stored-value cards. The cards act as gift certificates that can be used anywhere Visa and MasterCard are accepted.  They

look similar to Visa and MasterCard credit cards, but have prepaid amounts of money stored on them.

109.     Under Visa and MasterCard's "Honor All Cards" requirement, Best Buy has no choice but to accept these stored-value cards, just as they had no choice but to accept their off-line debit cards.

110.     Despite the absence of risk to Visa and MasterCard, and the added risk to retailers like Best Buy, Visa and MasterCard charge the same interchange fee for their stored-value cards that they do for their off-line debit products.

### *(4)     Visa and MasterCard eliminate their illegal tying arrangements pursuant to a class action settlement*

111.     In 1996, a class of merchants sued Visa and MasterCard challenging their Honor All Cards rules under Sections 1 and 2 of the Sherman Act.  On April 1, 2003, after considering a significant summary judgment record, the trial court granted the merchant class partial summary judgment.  *In re Visa Check/MasterMoney Antitrust Litigation,* NO. 96-CV-5238, 2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003).

112.     With respect to both Visa and MasterCard, the court granted the merchant class partial summary judgment on the first three elements of their antitrust tying claim.  *In re Visa Check/MasterMoney Antitrust Litigation,* 2003 WL 1712568, at * 2-3.

>  a.     First, the tying arrangements affect a substantial amount of interstate commerce:  "In 1999 alone, merchants processed over one hundred and fifty billion dollars in sales through the defendants' off-line debit cards. This figure is 'not insubstantial.'" *Id.*
>
>  b.     Second, "[o]verwhelming evidence establishes that merchant demand for credit card services is distinct from merchant demand for debit card services . . ." *Id*
>
>  c.     Third, "[Visa and MasterCard] indisputably tie the sale of their debit card services to the sale of their credit card services." *Id.*

113.    On the fourth element, the court held that Visa has appreciable market power in the tying market of general purpose card network services, and granted partial summary judgment on this element with respect to Visa.   *In re Visa Check/MasterMoney Antitrust Litigation,* 2003 WL 1712568, at *3.

114.    Shortly thereafter, Visa and MasterCard agreed to settle with the merchant class. Pursuant to this settlement agreement, Visa and MasterCard agreed to eliminate the Honor All Cards rules.  They also agreed to redesign their off-line debit cards, so that merchants can easily distinguish these debit cards from their credit cards, and to provide merchant access to information to assist in the electronic identification of off-line debit cards.

115.    Finally, as a term of the class action settlement, Visa and MasterCard also agreed on an interim basis to lower the previously fixed interchange rates for debit card transactions by approximately 33 percent.

### FIRST CLAIM FOR RELIEF:
### VIOLATIONS OF SHERMAN ACT, SECTION 1
### EXCLUSIONARY RULES

116.    Best Buy repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

117.    Throughout the relevant period, the Visa and MasterCard associations engaged in an unlawful contract, combination and conspiracy in unreasonable restraint of interstate trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

118.    At all times, Visa and MasterCard have had market power, both separately and together, in the general purpose card and general purpose card network services markets, as they can control prices or exclude competition in these relevant markets.

Word 20083373.1

119.    Visa and MasterCard each achieved their anticompetitive objectives by agreeing and enacting "exclusionary" rules that prohibited its members from issuing a competitor's cards, namely American Express and Discover.  Under these rules, members of Visa or MasterCard forfeited their right to issue Visa or MasterCard cards if they issued a competitor's cards.

120.    Each Defendant's contract, combination and conspiracy to enact exclusionary rules had, among others, the following intended and actual effects:

a.      output of competing payment cards and network services was limited and product and service innovation was suppressed;

b.      actual and potential competition in the general purpose and debit card network services markets was substantially excluded, suppressed, and effectively foreclosed;

c.      Defendants acquired and maintained market power in the relevant markets;

d.      Defendants controlled, maintained, and elevated above competitive levels the interchange fees charged to merchants, including Best Buy, for general purpose card and debit card network services;

e.      merchants, including Best Buy, were required to pay supra-competitive interchange fees for each Defendants' general purpose and debit card network services; and

f.      Defendants each derived direct and substantial economic benefits from the supra-competitive interchange fees for their general purpose and debit card network services.

121.    Each Defendant's exclusionary rule achieved no legitimate efficiency benefit to counterbalance its demonstrated anticompetitive effects in the general purpose and debit card network services markets.

122.    As a consequence of the Defendants' illegal combinations and conspiracies, Best Buy suffered injury in its business and property.  The specific amount of damages suffered by

38

Best Buy has not yet been determined, as such determination will require additional discovery and expert analysis, but Best Buy estimates that it will be in excess of $800 million.

## SECOND CLAIM FOR RELIEF:
## VIOLATIONS OF SHERMAN ACT, SECTION 1
## UNLAWFUL PRICE-FIXING OF INTERCHANGE FEES

123.    Best Buy repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

124.    Throughout the relevant period, Visa, MasterCard, and their members, who are all in competition with each other, engaged in unlawful contracts, combinations and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

125.    The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among Visa's issuing and acquiring members, MasterCard's issuing and acquiring members, and Visa and MasterCard, the substantial terms of which were to illegally fix, raise, maintain, or stabilize the interchange fees for the Defendants' general purpose and debit card network services.

126.    The members of Visa and MasterCard each achieved their anticompetitive objectives, in part, by agreeing, separately and together, to establish, implement, and maintain a price fixing scheme whereby they fixed supra-competitive interchange fees for each of their general purpose and debit card network services.

127.    Defendants' contracts, combinations and conspiracies to fix the price of their general purpose and debit card network services had, among others, the following intended and actual effects:

a.     actual and potential competition in the general purpose and debit card network services markets was substantially excluded, suppressed, and effectively foreclosed;

b.     Defendants acquired and maintained market power in the relevant markets;

c.     Defendants controlled, maintained, and elevated above competitive levels the interchange fees charged to merchants, including Best Buy, for general purpose card and debit card network services;

d.     merchants, including Best Buy, were required to pay supra-competitive interchange fees for each Defendants' general purpose and debit card network services; and

e.     Defendants each derived direct and substantial economic benefits from the supra-competitive interchange fees for their general purpose and debit card services.

128.  Each Defendant's price-fixing achieved no legitimate efficiency benefit to counterbalance its demonstrated anticompetitive effects in the general purpose and debit card network services markets.

129.  As a consequence of the Defendants' illegal combinations and conspiracies, Best Buy suffered injury in its business and property, in part, because it was forced to pay higher interchange fees for general purpose card and debit card network services than it would have paid in the absence of the Defendants' conduct. The specific amount of damages suffered by Best Buy has not yet been determined, as such determination will require additional discovery and expert analysis, but Best Buy estimates that it will be in excess of $800 million.

### THIRD CLAIM FOR RELIEF:
### VIOLATIONS OF SHERMAN ACT, SECTION 1
### ILLEGAL TYING ARRANGEMENTS

130.  Best Buy repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

40

Word 20083373.1

131.    Throughout the relevant period, the Visa and MasterCard associations engaged in an unlawful contract, combination and conspiracy in unreasonable restraint of interstate trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

132.    At all times, Visa and MasterCard had market power, both separately and together, in the general purpose card and general purpose card network services markets, as they can control prices or exclude competition in these relevant markets.

133.    Visa and MasterCard each achieved its anticompetitive objectives by tying the sale of its inferior off-line debit card network services to the sale of its ubiquitous general purpose card network services.  These tying arrangements forced and coerced merchants, including Best Buy, to accept Visa and MasterCard off-line debit card network services as a condition of accepting their general purpose card network services.

134.    Each Defendant's contract, combination and conspiracy to tie the sale of its off-line debit card network services to the sale of its general purpose card network services had, among others, the following intended and actual effects:

    a.    merchants, including Best Buy, were forced to accept each Defendant's inferior off-line debit cards at supra-competitive interchange rates;

    b.    actual and potential competition in the debit card network services markets was substantially excluded, suppressed, and effectively foreclosed;

    c.    Defendants acquired and maintained market power in the debit card and debit card network services markets;

    d.    Defendants controlled, maintained, and elevated above competitive levels the interchange fees charged to merchants, including Best Buy, for debit card network services;

    e.    merchants, including Best Buy, were required to pay supra-competitive interchange fees for Defendants' debit card network services; and

41

f.   Defendants derived direct and substantial economic benefits from the supra-competitive interchange fees for their debit card network services.

135.   Each Defendant's tying arrangement, which was eliminated effective January 1, 2004 as a result of its settlement of the class action, achieved no legitimate efficiency benefit to counterbalance its demonstrated anticompetitive effects in the debit card network services market.

136.   As a consequence of the Defendants' illegal combinations and conspiracies, Best Buy suffered injury in its business and property.  The specific amount of damages suffered by Best Buy has not yet been determined, as such determination will require additional discovery and expert analysis, but Best Buy estimates that it will be in the hundreds of millions of dollars.

**FOURTH CLAIM FOR RELIEF:**
**VIOLATIONS OF SHERMAN ACT, SECTION 2**
**GENERAL PURPOSE CARD AND GENERAL PURPOSE CARD NETWORK**
**SERVICES MARKETS**

137.   Best Buy repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

138.   In violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, Visa, MasterCard and their members knowingly, intentionally and with specific intent to do so, monopolized, conspired to monopolize, and/or attempted to monopolize the general purpose card and general purpose card network services markets.

139.   Through unfair, predatory, and anticompetitive means, Visa and MasterCard have, separately and together, obtained monopoly power in the United States general purpose card and general purpose card network services markets, as they can control prices or exclude competition in these markets.  In the alternative, the unfair, predatory, and anticompetitive

42

actions of Visa and/or MasterCard threaten a dangerous likelihood of achieving monopoly power in these markets.

140.    Visa and MasterCard willfully acquired and maintained monopoly power, or attempted to acquire such monopoly power, in the general purpose card and network services markets through the unfair, predatory, and anticompetitive overt acts set forth above. These overt acts include the Defendants' enactment of exclusionary rules that prohibit competitors from issuing general purpose cards through their members, which is essential for effective competition in these markets. Defendants and their members also monopolized or attempted to monopolize the general purpose card and network services markets by separately and collectively fixing the price of interchange fees for general purpose card network services.

141.    Defendants' monopolization or attempts to monopolize have had the following effects:

a.    instead of free, open and competitive general purpose card and general purpose card network services markets, a monopoly, or dominant position dangerously likely to become a monopoly, has been established and maintained in these markets;

b.    actual and potential competition in the general purpose card and general purpose card network services markets has been excluded, suppressed and effectively foreclosed;

c.    Defendants controlled, maintained, and elevated above competitive levels the interchange fees charged to merchants, including Best Buy, for general purpose card network services;

d.    merchants, including Best Buy, were required to pay supra-competitive interchange fees for Defendants' general purpose network services; and

e.    Defendants derived direct and substantial economic benefits from the supra-competitive interchange fees for their general purpose card network services.

43

142.   Visa and MasterCard conspired to conduct the above overt acts with the specific intent to acquire monopoly power in the general purpose card and general purpose card network services markets.   This conspiracy involved a unity of purpose, or common design and understanding, or a meeting of the minds to take certain overt acts with the specific intent to monopolize.

143.   Defendants' monopolistic conduct achieved no legitimate efficiency benefit to counterbalance their demonstrated anticompetitive effects in the general purpose card network services market.

144.   As a result of Defendants' violations of Section 2, Best Buy suffered injury in its business and property.   The specific amount of damages suffered by Best Buy has not yet been determined, as such determination will require additional discovery and expert analysis, but Best Buy estimates that it will be in excess of $800 million.

### FIFTH CLAIM FOR RELIEF:
### VIOLATIONS OF SHERMAN ACT, SECTION 2
### DEBIT CARD  AND DEBIT CARD NETWORK SERVICES MARKETS

145.   Best Buy repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

146.   In violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, Visa, MasterCard and their members knowingly, intentionally and with specific intent to do so, monopolized, conspired to monopolize, and/or attempted to monopolize the debit card and debit card network services markets.

147.   Through unfair, predatory, and anticompetitive means, Visa and MasterCard have, separately and together, obtained monopoly power in the United States debit card and debit card network services markets, as they can control prices or exclude competition in these

Word 20083373.1

markets. In the alternative, the unfair, predatory, and anticompetitive actions of Visa and/or MasterCard threaten a dangerous likelihood of achieving monopoly power in these markets.

148. Visa and MasterCard willfully acquired and maintained monopoly power, or attempted to acquire such monopoly power, in the debit card and debit card network services markets through the unfair, predatory, and anticompetitive overt acts set forth above. These overt acts include the Defendants' enactment of exclusionary rules that prohibit competitors from issuing debit cards through their members, which is essential for effective competition in these markets. Defendants and their members also monopolized or attempted to monopolize the debit card and debit card network services markets by separately and collectively fixing the price of interchange fees for debit card network services. Finally, Defendants monopolized or attempted to monopolize these markets by leveraging their market power in the general purpose card services market to obtain market power in the debit card services market through unlawful tying arrangements.

149. Defendants' monopolization or attempts to monopolize have had the following effects:

      a.     instead of free, open and competitive debit card and debit card services markets, a monopoly, or dominant position dangerously likely to become a monopoly, has been established and maintained;

      b.     actual and potential competition in the debit card and debit card services markets has been excluded, suppressed and effectively foreclosed;

      c.     Defendants controlled, maintained, and elevated above competitive levels the interchange fees charged to merchants, including Best Buy, for debit card services;

      d.     merchants, including Best Buy, were required to pay artificially high supra-competitive interchange fees for Defendants' debit card services; and

e.    Defendants derived direct and substantial economic benefits from the artificially high supra-competitive interchange fees for their debit card services.

150.   Visa and MasterCard conspired to conduct the above overt acts with the specific intent to acquire monopoly power in the debit card and debit card network services markets. This conspiracy involved a unity of purpose, or common design and understanding, or a meeting of the minds to take certain overt acts with the specific intent to monopolize.

151.   Defendants' monopolistic conduct achieved no legitimate efficiency benefit to counterbalance their demonstrated anticompetitive effects in the debit card network services market.

152.   As a result of Defendants' violations of monopolistic behavior, Best Buy suffered injury in its business and property.  The specific amount of damages suffered by Best Buy has not yet been determined, as such determination will require additional discovery and expert analysis, but Best Buy estimates that it will be in the hundreds of millions of dollars.

### SIXTH CLAIM FOR RELIEF:
### VIOLATIONS OF MINN. STAT. §§ 325D.51 AND 325D.53

153.   Best Buy repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

154.   Defendants and co-conspirators have continually engaged in an unlawful contract, agreement, combination, arrangement, and conspiracy in unreasonable restraint of trade and commerce of the State of Minnesota, in violation of Minn. Stat. §§ 325D.51 and 325D.53, including:

a.    enacting and enforcing rules that prohibit their member banks from issuing or providing services to competing general purpose credit cards, particularly American Express and Discover cards;

46

Word 20083373.1

    b.    illegally fixing, raising, and maintaining the interchange fees for Defendants' general purpose and debit card network services; and

    c.    illegally tying Defendants' off-line debit card and stored-value cards to their credit cards, forcing Best Buy to pay supra-competitive prices for an inferior product.

155.    Defendants' conduct in this regard achieves no legitimate efficiency to counterbalance their demonstrated anticompetitive effects.

156.    As a result of Visa and co-conspirators' violations of §§ 325D.51 and 325D.53, Best Buy has been injured in its business and property in an amount not presently known with precision but which is, at a minimum, tens of millions of dollars.

157.    Such violations and the effects thereof are continuing and will continue unless the injunctive relief requested is granted. Best Buy has no adequate remedy at law.

### SEVENTH CLAIM FOR RELIEF:
### VIOLATIONS OF MINN. STAT. § 325D.51 AND 325D.53

158.    Best Buy repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

159.    Defendants and co-conspirators have continually engaged in an unlawful contract, agreement, combination, arrangement, and conspiracy in the unreasonable restraint of trade and commerce of the State of Minnesota, in violation of Minn. Stat. §§ 325D.51 and 325D.53, including:

    a.    willfully acquiring and maintaining monopoly power, or attempting to acquire such monopoly power, in the debit card and debit card network services markets through the unfair, predatory, and anticompetitive overt acts set forth above; and

    b.    willfully acquiring and maintaining monopoly power, or attempting to acquire such monopoly power, in the general purpose card and general purpose card network services markets through the unfair, predatory, and anticompetitive overt acts set forth above.

47

160.  Defendants' conduct in this regard achieves no legitimate efficiency to counterbalance their demonstrated anticompetitive effects.

161.  As a result of Defendants and co-conspirators' violations of §§ 325D.51 and 325D.53, Best Buy has been injured in its business and property in an amount not presently known with precision but which is, at a minimum, tens of millions of dollars.

162.  Such violations and the effects thereof are continuing and will continue unless the injunctive relief requested is granted.  Best Buy has no adequate remedy at law.

## EIGHTH CLAIM FOR RELIEF:
## VIOLATIONS OF CAL. BUS. & PROF. CODE § 17200

163.  Best Buy repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

164.  Section 17200 of the California Business and Professions Code prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

165.  The acts of Defendants, as set forth above, constitute unlawful, unfair, and/or fraudulent business acts within the meaning of Cal. Bus. & Prof. Code § 17200, including:

    a.    enacting and enforcing rules that prohibit their member banks from issuing or providing services to competing general purpose credit cards, particularly American Express and Discover cards;

    b.    illegally fixing, raising, and maintaining the interchange fees for Defendants' general purpose and debit card network services; and

    c.    illegally tying Defendants' off-line debit card and stored-value cards to their credit cards, forcing Best Buy to pay supra-competitive prices for an inferior product.

166.    Defendants' conduct in this regard achieves no legitimate efficiency to counterbalance their demonstrated anticompetitive effects.

167.    Best Buy, pursuant to Cal. Bus. & Prof. Code § 17200, seeks (a) an order of this Court compelling Defendants to provide restitution and to disgorge the monies collected and profits realized by them as a result of their unfair and fraudulent business practices; and (b) injunctive relief, calling for Defendants to cease such unfair business practices in the future.

## VIII.
## PRAYER FOR RELIEF

WHEREFORE, Best Buy respectfully demands:

A.    That the Court declare, adjudge and decree that Defendants have committed the violations of federal and state law alleged herein;

B.    That the Court award damages sustained by Best Buy in an amount to be proved at trial, including attorneys' fees and costs of suit, and such other and further relief as this Court may deem just and proper;

C.    That the Court adopt such measures as may be necessary to restore competition in the relevant markets; and

D.    That the Court enters an injunction prohibiting Visa and MasterCard from engaging in the conduct complained of herein.

## IX.
## JURY DEMAND

Best Buy hereby demands trial by jury of all issues properly triable thereby.

Respectfully submitted,

Word 20083373.1

Dated:  March 19, 2004

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

By: _____
Elliot S. Kaplan (EK-6683)
K. Craig Wildfang (KW-0294)
Anne M. Lockner (AL-1728)

2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, Minnesota  55402-2015
Telephone:  612-349-8500
Facsimile:  612-339-4181

ATTORNEYS FOR PLAINTIFFS BEST BUY
STORES, L.P., MAGNOLIA HI-FI, INC., AND
GEEK SQUAD, INC.

50

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

---

BEST BUY STORES, L.P., MAGNOLIA HI-FI,
INC., AND GEEK SQUAD, INC.,

           Plaintiffs,

v.

VISA U.S.A., INC. and MASTERCARD
INTERNATIONAL, INC.,

           Defendants.

**CERTIFICATE OF SERVICE**

**MDL No.** 1575
**Case No.** 03-CV-6284-JG-RLM

---

I hereby certify that on March 19, 2004 the following document was filed:

## AMENDED COMPLAINT OF PLAINTIFFS BEST BUY STORES, L.P., MAGNOLIA HI-FI, INC., AND GEEK SQUAD, INC.

with the Clerk of the Court, and served in accordance with the Federal Rules of Civil Procedure,

and/or the Eastern District's Local Rules, and/or the Eastern District's Rules On Electronic Service

upon the following parties and participants:

Michael Dockterman
**WILDMAN, HARROLD, ALLEN & DIXON**
225 West Wacker Drive
Chicago, IL 60606
PH: 312/201-2000
**FX: 312/201-2555**
docketerm@wildmanharrold.com

Counsel for Plaintiff Toys "R" Us, Inc.

20084116.1

Kenneth A. Gallo
**PAUL, WEISS, RIFKIND, WHARTON &**
    **GARRISON LLP**
1615 L Street, N.W.
Washington, DC 20036-5694
PH:  202/223-7300
**FX:  202/223-7456**
Kgallo@paulweiss.com

Counsel   for   Defendant   MasterCard
International, Inc.

David M. Goldstein
**HELLER  EHRMAN  WHITE  &  MCAULIFFE
LLP**
333 Bush Street
San Francisco, CA 94104-2878
PH:  415/772-6000
**FX:  415/772-6268**
dgoldstein@hewm.com

Counsel for Defendant Visa U.S.A., Inc.

Mitchell H. Macknin
**SPERLING & SLATER, P.C.**
55 West Monroe Street, Suite 3300
Chicago, IL 60606
PH:     312/641-3200
**FX:     312-641-6492**
mhmacknin@sperling-law.com

Counsel for Plaintiffs CVS Corporation and
CVS Pharmacy, Inc.

Bernard D. Marcus
**MARCUS & SHAPIRA LLP**
35th Floor, One Oxford Centre
Pittsburgh,  PA 15219-6401
PH:  412-471-3490
**FX:  412/391-8758**
BDM@Marcus-Shapira.com

Counsel  for  Plaintiffs  Giant  Eagle,  Inc.,
Riser  Foods  Company,  and  The  Tamarkin
Company

Reginald R. Smith
**KING & SPALDING LLP**
1100 Louisiana, Suite 4000
Houston, TX 77002
PH:  713/751-3200
**FX:  713/751-3290**
rsmith@kslaw.com

Counsel for Plaintiff Home Depot  U.S.A.,
Inc.

A courtesy copy of the aforementioned document was also provided to the following:

>The Honorable John Gleeson
>United States District Judge
>Eastern District of New York
>225 Cadman Plaza East
>Brooklyn, New York 11201
>
>The Honorable Roanne L. Mann
>United States District Judge
>Eastern District of New York
>225 Cadman Plaza East
>Brooklyn, New York 11201

Dawn M. Van Alstine

Subscribed and sworn to before me
this 19th day of March, 2004.

Notary Public

MELANIE K. ANDERSON
NOTARY PUBLIC - MINNESOTA
My Commission Expires 1-31-2005